NOT DESIGNATED FOR PUBLICATION

No. 123,190

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JERRY W. CAMPBELL,
*Appellant*.


MEMORANDUM OPINION

Appeal from Douglas District Court; AMY J. HANLEY, judge. Opinion filed July 1, 2022. Reversed and remanded with directions.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Brian Deiter*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ISHERWOOD, P.J., GREEN and BRUNS, JJ.


ISHERWOOD, J.: A jury convicted Jerry W. Campbell of two counts of possessing methamphetamine and four counts of possessing drug paraphernalia with intent to use to distribute. Campbell appeals those convictions, arguing that the trial court committed reversible error by admitting prior bad acts evidence at his jury trial and by granting the State's motion to reconsider its original ruling granting his suppression motion. He also argues that the prosecutor committed reversible error by using an inflammatory hypothetical to describe his presumption of innocence during voir dire. And he concludes his appeal by arguing that cumulative error otherwise requires the reversal of his

1

convictions. As considered below the trial court's erroneous admission of prior bad acts evidence denied Campbell his right to a fair trial. Accordingly, his convictions are reversed, and his case remanded for a new trial.

FACTS

On November 20, 2017, law enforcement applied for and received a search warrant to place a GPS tracking device on Campbell's car. In the affidavit supporting this search warrant, Officer Kristen Kennedy alleged that Campbell was a methamphetamine distributor. As proof, Officer Kennedy cited Campbell's prior encounters with law enforcement that year. Those encounters included Campbell's May 21, 2017 (May stop), July 18, 2017 (July stop), and September 23, 2017 (September stop) encounters where law enforcement found what appeared to be methamphetamine and drug paraphernalia in Campbell's car.

After attaching a GPS tracker to Campbell's car, law enforcement monitored Campbell's movements for about a month. On the evening of December 28, 2017, and the early morning hours of December 29, 2017, law enforcement physically followed Campbell while also using the GPS tracker. They followed Campbell as he drove his girlfriend, Kayla Stroda, from Lawrence, Kansas, to Kansas City, Missouri, and back towards Lawrence. Then, around 3 a.m., Deputy Taylor Zook stopped and arrested Campbell just outside of Lawrence, Kansas because he was driving without a valid license. Afterward, a drug sniffing dog alerted that Campbell's car contained drugs. During the ensuing search, law enforcement found what appeared to be methamphetamine, pill pieces, and drug paraphernalia in Campbell's car. Following his arrest, Deputy Zook questioned Campbell about the methamphetamine found in his car. According to the deputy's later trial testimony, Campbell denied knowing about the methamphetamine, denied that the methamphetamine may have belonged to Stroda, and

2

suggested that maybe someone he had given a ride to left the methamphetamine in his car.

Law enforcement sent samples of the apparent drugs discovered in Campbell's car on the May stop, July stop, September stop, and December 29, 2017 (December stop), to the Kansas Bureau of Investigation (KBI) for lab testing. KBI lab testing indicated that the crystal substance seized from Campbell's car on each of those dates was methamphetamine. It also indicated that the pill pieces seized from Campbell's car on the December stop, contained buprenorphine and diazepam.

Eventually, based on the items seized from his car on the May stop, Campbell was convicted of one count of possessing methamphetamine with the intent to distribute, two counts of possessing drug paraphernalia for distribution purposes, and one count of possessing drug paraphernalia for personal use. In a separate case, based on items seized from his car on the July stop, Campbell was convicted of one count each of possessing methamphetamine with the intent to distribute, possessing drug paraphernalia for distribution purposes, and possessing drug paraphernalia for personal use. In both criminal cases, the trial court sentenced Campbell to consecutive 111-month prison terms.

For his September stop and the December stop encounters with law enforcement, though, the State charged Campbell with several crimes in a single case. Based on the items seized from his car on the September stop, the State charged Campbell with the following: (1) one count of methamphetamine possession with the intent to distribute—a severity level 4 drug felony in violation of K.S.A. 2017 Supp. 21-5705(a)(1); (2) two counts of possessing drug paraphernalia with the intent to use to distribute drugs—both severity level 5 drug felonies in violation of K.S.A. 2017 Supp. 21-5709(b)(1); and (3) one count of child endangerment—a severity class A misdemeanor in violation of K.S.A. 2017 Supp. 21-5601(a). As to this last charge, Campbell's daughter was in his car when

3

law enforcement arrested him on the September stop. On the other hand, based on the items seized from his car on the December stop, the State charged Campbell with the following: (1) one count of possessing methamphetamine with the intent to distribute—a severity level 2 drug felony in violation of K.S.A. 2017 Supp. 21-5705(a)(1); (2) two counts of possessing drug paraphernalia with intent to use to distribute drugs—both severity level 5 drug felonies in violation of K.S.A. 2017 Supp. 21-5709(b)(1); (3) one count of possessing diazepam with intent to distribute—a severity level 4 drug felony in violation of K.S.A. 2017 Supp. 21-5705(a)(2); and (4) one count of possessing buprenorphine—a severity level 5 drug felony in violation of K.S.A. 2017 Supp. 21-5706(a).

Before his jury trial, Campbell moved to suppress all the evidence seized from his car on the December stop. Campbell's written suppression motion broadly argued that law enforcement lacked probable cause to search his car on the December stop. Initially, the trial court suppressed the December stop evidence, ruling that law enforcement used the GPS tracker to search Campbell's car after the GPS search warrant had expired. But after hearing evidence and arguments on the State's motion to reconsider, it reversed this ruling. It determined that although law enforcement relied on the GPS tracker to monitor Campbell's movements after the search warrant's technical expiration, the evidence seized from Campbell's car on the December stop, was admissible because the warrant's technical expiration resulted from Officer Kennedy's clerical error.

In addition to its reconsideration motion, before Campbell's jury trial, the State moved to admit evidence of Campbell's prior bad acts under K.S.A. 60-455. In its written K.S.A. 60-455 motion, the State argued that evidence from Campbell's May stop and July stop encounters with law enforcement should be admissible at Campbell's upcoming jury trial because Campbell's intent to distribute methamphetamine and intent to possess drug paraphernalia with the intent to distribute were material facts in dispute for two reasons: (1) because Campbell had pleaded not guilty to the methamphetamine-related offenses on

4

the September stop, and the December stop; and (2) because Campbell had given Deputy Zook an innocent explanation why there was methamphetamine in his car on the December stop. Campbell opposed the State's motion, arguing that the prejudicial effect of the evidence outweighed the probative value of the evidence. He also argued that his postarrest comments to Deputy Zook did not constitute an innocent explanation. But the trial court disagreed with Campbell's arguments. It granted the State's motion, allowing the State to admit evidence of Campbell's prior bad acts to generally establish Campbell's intent and to evaluate the veracity of his innocent explanation.

At Campbell's jury trial, the State presented the testimony of the law enforcement officers who searched Campbell's car on the May stop, July stop, September stop and December stop. Their testimony along with the testimony of KBI forensic scientists supported that Campbell had 41.62 grams of methamphetamine in his car on the May stop, 9.95 grams of methamphetamine in his car on the July stop, trace amounts of methamphetamine in his car on the September stop, and 7.75 grams of methamphetamine in his car on the December stop. Their combined testimony also supported that Campbell had drug paraphernalia in his car on each of those dates.

Campbell did not present an opening argument or any evidence. Instead, Campbell only made closing arguments in which he emphasized that the State carried the burden of proof. In doing so, he stressed that the State presented no direct evidence that he knew about the methamphetamine or drug paraphernalia found in his car on the September stop and the December stop. He argued that the State failed to prove that he was guilty of any crimes. Alternatively, he asserted that at best, it had proven that he had possession of the drug-related items in his car.

During the jury instruction conference, the trial court granted the State's request to instruct the jury that it could consider the prior bad acts evidence "as evidence of the defendant's knowledge, intent, and to prove the truth or falsity of the defendant's innocent

5

explanation." Also, the trial court granted the State's request to instruct the jury on simple possession of methamphetamine—a severity level 5 drug felony in violation of K.S.A. 2017 Supp. 21-5706(a)—as a lesser included offense of both possession of methamphetamine with intent to distribute charges.

Ultimately, for the September stop charges, the jury found Campbell guilty of the two counts of possessing drug paraphernalia with the intent to use to distribute. But it rejected the State's request to convict Campbell of possessing methamphetamine with the intent to distribute. Instead, it convicted Campbell of the lesser included offense of simply possessing methamphetamine. Then, it acquitted Campbell of child endangerment. As for the December stop charges, the jury entered similar verdicts. It found Campbell guilty of the two counts of possessing drug paraphernalia with intent to use to distribute. For the possession of methamphetamine with intent to distribute charge, the jury found Campbell guilty of the lesser included offense of simple possession. Yet, it acquitted Campbell of possessing diazepam and buprenorphine.

At Campbell's sentencing, the trial court imposed a total controlling sentence of 31 months' imprisonment followed by 12 months' postrelease supervision for his two methamphetamine possession and four drug paraphernalia possession with intent to use to distribute convictions. After his sentencing, Campbell timely appealed his convictions to this court. Additional relevant facts are addressed below.

ANALYSIS

DID THE TRIAL COURT ERR BY GRANTING THE STATE'S MOTION TO ADMIT EVIDENCE OF THE PRIOR BAD ACTS?

Campbell's main argument on appeal is that this court should reverse his two methamphetamine possession convictions and four drug paraphernalia with intent to use to distribute convictions because the trial court erred when it allowed the State to admit

evidence from his May stop and July stop law enforcement encounters at his jury trial. In making this argument, Campbell challenges the trial court's admission of the prior bad acts evidence in several ways that can be summarized into the following alternative arguments: (1) that the prior bad acts evidence was inadmissible to prove any charges against him because his intent to possess and intent to distribute were not at issue at his trial; (2) that the prior bad acts evidence was inadmissible to prove any charges against him because he never gave Deputy Zook an innocent explanation why there was methamphetamine in his car on the December stop; (3) that the prior bad acts evidence was inadmissible to prove any charges against him related to his September stop encounter with law enforcement because he never gave law enforcement an innocent explanation on that date; (4) that the prior bad acts evidence was inadmissible to prove any of the possession of drug paraphernalia with intent to use to distribute charges against him because the prior bad acts were not factually similar to those charged crimes; and (5) that the prior bad acts evidence was inadmissible because the prejudicial effect of its admission substantially outweighed its probative value. To support his arguments, Campbell largely relies on our Supreme Court's decisions in *State v. Brazzle*, 311 Kan. 754, 466 P.3d 1195 (2020) (*Brazzle II*); *State v. Rosa*, 304 Kan. 429, 371 P.3d 915 (2016); and *State v. Boggs*, 287 Kan. 298, 197 P.3d 441 (2008).

In its brief, however, the State counters that this same caselaw undermines Campbell's alternative arguments. Regarding Campbell's argument that his intent was never in dispute, the State contends that his intent was in dispute because Campbell's "arguments at trial focused only on whether he had the requisite intent to distribute the contraband." The State supports this argument by citing Campbell's cross-examination of Officer Matthew Roberts—an officer involved in Campbell's May stop and September stop arrests—and his closing arguments. It also argues that "Campbell placed his knowledge and intent to possess the contraband into dispute" by telling law enforcement "that he was unaware of the presence of the contraband" and "that it may have been left in his vehicle by a passenger." As for Campbell's argument that the prejudicial effect of

7

the prior bad acts evidence outweighed it probative value, the State concedes that the trial court did not specifically reference the factors to be considered in our Supreme Court's probative-versus-prejudice test outlined in *State v. Boysaw*, 309 Kan. 526, 541, 439 P.3d 909 (2019), when ruling that the prior bad acts evidence was admissible. All the same, it argues that "[e]ven when the facts of [Campbell's] case are viewed under the *Boysaw* factors, the probative value of [the prior bad acts] evidence greatly outweighs its potential for undue prejudice."

A. *Additional Background*

In its written K.S.A. 60-455 motion, the State argued that it should be allowed to present evidence of Campbell's May stop and July stop encounters with law enforcement at his jury trial because it was relevant to Campbell's "intent to distribute methamphetamine." Specifically, the State asked to present evidence of the following: (1) that law enforcement seized 41.62 grams of methamphetamine, scales, "multiple baggies," and a drug ledger from Campbell's car on the May stop; and (2) that law enforcement seized 9.95 grams of methamphetamine, scales, and 25 baggies from Campbell's car on the July stop. In making this argument, the State never addressed the underlying facts of Campbell's May stop and July stop encounters with law enforcement. Instead, it argued that by pleading not guilty to the charges stemming from his September stop and December stop encounters with law enforcement, Campbell's intent to distribute methamphetamine was a material fact in dispute.

In this motion, the State also argued that it should be allowed to present evidence of Campbell's May stop and July stop encounters with law enforcement at his jury trial to disprove Campbell's innocent explanation to Deputy Zook on the December stop regarding why methamphetamine was in his car. There, it described Campbell's explanation to Deputy Zook as follows: "[Campbell] denied knowing anything about the methamphetamine in his vehicle and said that sometimes he offers people rides and

8

possibly one of them left [it] in his vehicle." It then cited our Supreme Court's *Rosa* decision to support its proposition that Campbell's encounters with law enforcement on the May stop and the July stop were relevant to disprove Campbell's innocent explanation to Deputy Zook on the December stop. Concerning prejudice, the State simply argued that the probative value of the evidence seized from Campbell's car "far outweigh[ed] any prejudice."

At the start of the State's K.S.A. 60-455 motion hearing, the State mostly repeated the arguments in its written K.S.A. 60-455 motion. But the prosecutor representing the State added that the alleged innocent explanation that Campbell gave involved Stroda and Officer Trowbridge. The prosecutor alleged that after Campbell was stopped by Officer Trowbridge on December 29, 2017, he told the officer that *Stroda "must have left these . . . . drugs in my car."* (Emphasis added.) In response, Campbell argued that any comment he made was not an innocent explanation under *Rosa*'s authority. He also argued that the trial court should not admit evidence from his May stop and July stop encounters with law enforcement for any purpose because the admission of this evidence would be far more prejudicial than probative.

The prosecutor countered that the context of Campbell's explanation on the December stop was important for purposes of evaluating the evidence from his May stop and July stop encounters with law enforcement. She asserted:

> "Judge, I'll give you the context. And it's been a while, but the Court heard a suppression hearing from Officer Trowbridge and Officer Kennedy and a preliminary hearing. Officer Kennedy had been surveilling [Campbell] in an unmarked vehicle, saw who they later learned . . . was Kayla Stroda enter into [Campbell's] vehicle. Officer Kennedy was just a little ways down, saw what she believed was a quick stop. Stroda exited the vehicle. She contacted, 'she' being Officer Kennedy, contacted Officer Trowbridge who was a patrol officer to initiate a traffic stop because they knew

[Campbell] was driving on a suspended license. So this is all on the in-car video of Officer Trowbridge and has been available to [Campbell].

"*Officer asks* [Campbell] *if he's got any weapons, and he's got knives on him and he says there's a gun in the center console. Officer Trowbridge reaches in to get the gun, has a hard time getting it out and sees drug paraphernalia. Searches the vehicle.* [Campbell] *is right there in the patrol vehicle while his vehicle is clearly being searched and makes these statements to Officer Trowbridge in the context of having his vehicle being searched. I would submit it's because he knew what would be located in there. Otherwise, why would it matter if someone left anything in his car. It would be—why even say that. Because obviously he knew something illegal was being located.*" (Emphasis added.)

Immediately after the prosecutor argued the preceding, the trial court granted the State's K.S.A. 60-455 motion, ruling:

"Context is that this occurred after the illegal items were located in the car, and the State's argument is persuasive. *He was there. He saw that they were searching the car. He knew that they would find illegal items, which they did, and he then made the voluntary statement that the woman had left something in his car. Of course it's prejudicial. That's the only reason the State wants to introduce it. And balancing that and based on Rosa, the prejudicial value does not outweigh the probative value and the State's motion is granted.*" (Emphasis added.)

At a later hearing, the State pointed out that the trial court never ruled on its request to admit evidence from Campbell's May stop and July stop encounters with law enforcement because Campbell disputed his intent to distribute methamphetamine by pleading not guilty to the September stop and December stop methamphetamine-related charges. Thus, at this later hearing, the State asked the trial court to rule on this argument.

As he did before, Campbell responded that allowing the State to present evidence from his May stop and July stop encounters with law enforcement for purposes of

10

establishing his intent would be "horribly prejudicial." He argued that the trial court should deny the State's renewed K.S.A. 60-455 motion because it "should let the facts speak for themselves and not put intent in where it doesn't need to be there . . . ." He further complained that the State's argument ignored that he never gave law enforcement an innocent explanation when they found methamphetamine and drug paraphernalia in his car on September 23, 2017.

But the trial court granted the State's renewed K.S.A. 60-455 motion for the following reasons:

> "Intent is an issue in all of these crimes that are charged as possession with intent to use or to distribute. *And* [*Campbell*] *has denied that he has that intent.* . . .
> "The prior incidents on May 21st, 2017, and July 18th, 2017, all also involve scales with residue, baggies with meth or on the 23rd of September residue, and multiple unused baggies, so they are all similar in that way. And on the 29th of December an innocent explanation was given *as was given on July 18th of 2017*. And so these prior incidents May 21st, '17, July 18th of '17, are relevant to intent which is a disputed material fact and an element that the State is required to prove. And so the only remaining issue is whether the probative value is outweighed by the prejudice to [Campbell], and the Court finds that it is not." (Emphases added.)

At Campbell's jury trial, before opening arguments, Campbell noted that he disagreed with the trial court's ruling on the prior bad acts evidence because he believed it was propensity evidence. He explained that if the trial court would not reconsider this ruling, he wanted a continuing objection to the admission of this evidence. He told the trial court that he was raising this issue now so he would not have to interrupt the State's opening argument, assuming the State addressed the prior bad acts in its opening argument. The State responded that it intended to address the prior bad acts evidence in its opening argument. At this point, the trial court rejected Campbell's request to reconsider the admission of the prior bad acts evidence. But it granted Campbell's request for a continuing objection as to the State's opening arguments: "Since [the prosecutor] is

going to refer to [the prior bad acts evidence] in opening, I'm going to note now for the record that [Campbell's] objection is made, noted, and preserved so that you don't have to interrupt."

Afterward, the State spent most of its opening arguments explaining that local law enforcement was familiar with Campbell because he was a known methamphetamine distributor that they had previously arrested for committing drug crimes:

"Officer Roberts will tell you that he was familiar with Jerry Campbell because he'd stopped him back on May 21st, 2017. Again, there was a warrant for his arrest, and he was aware that Mr. Campbell was driving without a valid license.

"During the stop, Officer Roberts developed probable cause to search [Campbell]'s vehicle. And inside, located in a red zippered container in the console area of the vehicle, he found two baggies of methamphetamine, each weighing .89 grams, and the other one weighed .160 grams.

"He also found a black backpack in the backseat. And inside that backpack, one of the pockets, he found 88 small Ziploc baggies. And in another pocket he found 44 small Ziploc baggies. They were unused, but they were used with the intent to distribute methamphetamine.

"His backpack also contained a black box that was locked. And he—Officer Roberts recalled that Mr. Campbell had been wearing a necklace with a key when he arrested him, and he went back to get the key and later found it in the defendant's pocket. It unlocked that box.

"Inside that box were six baggies of crystal methamphetamine. Inside of some of those bags were other bags. So there was a total of 13 baggies, and they were weighed and tested by the KBI as methamphetamine. The net weights were 6.89 grams, 3.5 grams, 3.45 grams, 3.46 grams, 3.48 grams, 3.57 grams, 3.48 grams, 3.44 grams, 1.74 grams, 1.73 grams, 1.76 grams, 1.7 grams, and 1.03 grams, totaling 41.62 grams of methamphetamine.

"You'll hear evidence that those weights are significant in the distribution of methamphetamine. The evidence will be that the normal use amount of methamphetamine is a quarter to a half a gram. The typical distribution amounts are a

teener, or a Tee, which is 1/16th of an ounce or 1.75 grams. An 8-ball or an 8, which is an eighth of an ounce or 3.45 grams.

"Also in the backpack was a digital scale with methamphetamine residue, a measuring spoon used to weigh out the methamphetamine for distribution, and 82 small Ziploc baggies used to package that methamphetamine for distribution.

"Officer Roberts also collected, inside that locked box, a little notebook which, based on his training and experience, he believed was a drug ledger. Officer Roberts was familiar with many of the names written in that book as users of methamphetamine in this community.

"You'll hear from Officer Kristen Kennedy and Sergeant Mark Mehrer. Back in 2017, Sergeant Mark Mehrer . . . and Kristen Kennedy were assigned to the Drug Enforcement Unit. That's a joint task force between the Lawrence Police Department and the Douglas County Sheriff's Office.

"Officer Kennedy had obtained a search warrant to affix a tracking device to [Campbell]'s vehicle so that they could track where it went. She'll tell you that she was familiar with Officer Roberts' stop of [Campbell] back on May 21st, and she also had a personal encounter with [Campbell]. And that was on July 18th of 2017.

"With a Drug Enforcement Unit, she drove an unmarked police vehicle, so it didn't look like a police car. She was driving, and then she realized [Campbell] was in front of her. She noticed that he, specifically, was wearing a multicolored ball cap. She followed him and saw him turn in to an apartment complex and park in a parking stall for several minutes.

"Pretty soon, a woman exited from the apartment complex and got into the passenger seat for two to three minutes and then left. Based on her training and experience, she believed she had witnessed what's called a short stop or a quick stop, which is a drug transaction.

"A few minutes later, Jerry Campbell pulls out of the parking lot. She follows him. She gets ahold of a patrol officer who's in a marked patrol vehicle, relays that information and also the information that Mr. Campbell is driving on a suspended license.

"So Officer Trowbridge is the one who responded and initiated a traffic stop of [Campbell]. During that traffic stop, officers developed probable cause to search Mr. Campbell's vehicle.

13

"In a bag on the center console was 2.8 grams of methamphetamine, and there was a red box, a little plastic red box with a white plus sign. Inside of that, there were 18 Ziploc baggies and another 13 Ziploc baggies used to package methamphetamine, and a digital scale for weighing methamphetamine for distribution.

"The hat that Jerry Campbell had been wearing, that multicolored baseball hat, was located on the passenger side floor. It was collected. And right behind the bill, in a zippered compartment, officers located a lot of cash and one bag of methamphetamine weighing 1.3 grams, and then another bag that contained three bags of methamphetamine.

"Those three bags were all marked with—by black permanent marker. One had a T for teener, and it weighed 1.75 grams. Two of them had an 8 for 8-ball. They each weighed 3.45 grams and 3.46 grams. Those were tested by the KBI to be methamphetamine."

In its case in chief, the State's first and second witnesses were Officer Roberts and Officer Kennedy, respectively. It had Officer Roberts testify about discovering 41.6 grams of methamphetamine and drug paraphernalia in Campbell's car on the May stop after Campbell was arrested for driving on a suspended license. It had Officer Kennedy testify about finding 8.65 grams of methamphetamine and drug paraphernalia in Campbell's car on the July stop, after Campbell was arrested for driving on a suspended license. Although Officer Kennedy also testified about Campbell's December stop arrest, the State primarily relied on Deputy Zook to testify about what occurred following Campbell's arrest on that date.

During this testimony, Deputy Zook explained that on December 29, 2017, after he had driven Campbell to jail and Campbell had waived his *Miranda* rights, he "ask[ed Campbell] about whether he knew anything about methamphetamine in his car." According to the deputy, Campbell responded that "he wasn't aware that there was any methamphetamine in his car." Deputy Zook explained that "since he didn't know about the methamphetamine in his car," he then asked Campbell "if he believed that it could have come from [Stroda]." Deputy Zook testified that Campbell answered that "*he was certain the methamphetamine didn't come from her*" but that "*he gives people rides often,*

*and that it's possible that someone who he'd given a ride to had left the methamphetamine in his car*." (Emphases added.)

Campbell did not present an opening argument. Nor did he present any evidence on his behalf. Yet, Campbell did cross-examine the State's witnesses. When cross-examining Officer Roberts about the September stop, for instance, Campbell questioned the officer about how much methamphetamine he found in his car on that date. During this cross-examination, Officer Roberts admitted that on the September stop, he found only trace amounts of methamphetamine in Campbell's car. He also agreed with Campbell's proposition that he found no drug that "could have [been] possessed with an intent to distribute" because law enforcement did not discover a "distributable amount" of methamphetamine in his car on that date.

During the jury instruction conference, the trial court granted the State's request to give the jury the following instruction over Campbell's objection: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. It may be considered solely as evidence of the defendant's knowledge, intent, and to prove the truth or falsity of the defendant's innocent explanation." It also granted the State's request to instruct the jury on simple possession of methamphetamine as a lesser included offense of the two possessions of methamphetamine with intent to distribute charges.

In its closing arguments, the State emphasized Campbell's prior bad acts. After briefly discussing the direct evidence indicating that Campbell possessed methamphetamine with the intent to distribute it on September 23, 2017, and December 29, 2017, the State stressed that the jury could consider his prior bad acts when evaluating whether he had the intent to distribute. The State argued that it had established Campbell's intent to distribute because the May stop, July stop, September stop, and December stop incidences all resulted in law enforcement finding methamphetamine,

15

baggies, and digital scales in his car. It argued that Campbell must have been intending to distribute the methamphetamine found in his car on the September stop, and the December stop, because the jury had not "hear[d] any evidence that Jerry Campbell is a user of methamphetamine." Instead, it argued that "[t]he only evidence that [the jury had] heard [was] that [Campbell was] a distributor or seller of methamphetamine." Also, during the State's rebuttal, the prosecutor repeatedly told the jury to evaluate Campbell's intent to possess and to distribute by considering his May stop and July stop encounters with law enforcement.

In his closing arguments, Campbell asserted that the State failed to prove any of the charges against him beyond a reasonable doubt because its evidence left too "many unanswered questions." Alternatively, he argued that the State had not proven his guilt beyond a reasonable doubt as to the charges stemming from his September stop arrest because no evidence proved his intent to distribute methamphetamine. In particular, Campbell stressed (1) that the State had not presented any evidence about what he was doing before his arrest on that date and (2) that the State's evidence indicated that he only had a trace amount of methamphetamine in his car on that date. As for the charges stemming from his December stop arrest, Campbell noted that the State had not presented any evidence about what happened to Stroda following his arrest or whether Stroda was involved in drug distribution. He argued that because the State failed to address the possibility that the illegal items found in his car on the December stop belonged to Stroda, the State failed to prove his guilt beyond a reasonable doubt.

B. *Applicable law*

To review, the State charged Campbell with two counts of possessing methamphetamine with intent to distribute contrary to K.S.A. 2017 Supp. 21-5705(a). One charge stemmed from his September stop arrest and the other charge stemmed from his December stop arrest. K.S.A. 2021 Supp. 21-5705(a) provides that it "shall be

unlawful for any person to distribute or possess with the intent to distribute" certain drugs, including methamphetamine. For both charges, though, the jury convicted Campbell of the lesser included offense of simply possessing methamphetamine under K.S.A. 2021 Supp. 21-5706(a). K.S.A. 2021 Supp. 21-5706(a) provides that it "shall be unlawful for any person to possess" certain drugs, including methamphetamine. The term "possession" means "having joint or exclusive control over an item *with knowledge of and intent to have such control* or knowingly keeping some item in a place where the person has some measure of access and right of control." (Emphasis added.) K.S.A. 2021 Supp. 21-5701(q). And the jury was instructed on this definition when considering the charges. As a result, when the jury convicted Campbell of possessing methamphetamine, it may have done so because it found that Campbell intended to have joint or exclusive control of the methamphetamine discovered in his car.

As for his drug paraphernalia with intent to distribute convictions, the jury found Campbell guilty as charged of violating K.S.A. 2017 Supp. 21-5709(b)(1) four times. K.S.A. 2017 Supp. 21-5709(b)(1) states that it "shall be unlawful for any person to use or *possess with intent to use any drug paraphernalia to*: (1) Manufacture, cultivate, plant, propagate, harvest, test, analyze or distribute a controlled substance." (Emphasis added.) At Campbell's trial, the jury instructions specifically required the jury to find that Campbell "*possessed*" certain drug paraphernalia "*with the intent to use* [*them*] as drug paraphernalia to distribute methamphetamine." (Emphasis added.) Hence, when the jury convicted Campbell of possessing drug paraphernalia with intent to distribute, it may have found that Campbell intentionally had joint or exclusive control over the drug paraphernalia. Yet, because this charge required the jury to find that Campbell intended to use the drug paraphernalia to distribute methamphetamine, it follows that when convicting Campbell of possessing drug paraphernalia with intent to distribute, it necessarily found that Campbell intended to use that drug paraphernalia for methamphetamine distribution purposes.

17

So, as outlined in Campbell's brief, his crimes of conviction had two separate intents at issue. To properly convict him of methamphetamine possession and drug paraphernalia possession with the intent to distribute, the State had to prove beyond a reasonable doubt that he possessed the methamphetamine and drug paraphernalia, which it could have established by presenting evidence that he intended to have joint or exclusive control of the methamphetamine and drug paraphernalia discovered in his car. Meanwhile, to properly convict him of drug paraphernalia with intent to distribute, the State had to prove beyond a reasonable doubt that Campbell intended to use the drug paraphernalia to distribute methamphetamine.

Under K.S.A. 2021 Supp. 60-455(a), "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." Still, K.S.A. 2021 Supp. 60-455(b) states that evidence of a person's prior bad act may be admitted "to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Therefore, under K.S.A. 2021 Supp. 60-455, "evidence a defendant committed a crime or civil wrong is inadmissible to prove the defendant's propensity to commit the crime charged, but it is admissible if relevant to prove some other material fact." *State v. Preston*, 294 Kan. 27, 32, 272 P.3d 1275 (2012).

When reviewing a challenge to the trial court's admission of prior bad acts evidence under K.S.A. 2021 Supp. 60-455, this court considers the trial court's ruling in three steps that correspond with the trial court's three-part test for admitting K.S.A. 60-455 evidence. Under the first step, this court uses de novo review to determine whether the trial court correctly found that the fact to be proven by the prior bad act evidence is material. A fact is a material fact when the "'fact has some real bearing on the decision in the case.'" *State v. Haygood*, 308 Kan. 1387, 1392, 430 P.3d 11 (2018). Under the second step, this court reviews the trial court's determination on "whether the material fact is

18

disputed and, if so, whether the evidence is relevant to prove the disputed material fact" under the abuse of discretion standard. 308 Kan. at 1392. A trial court abuses its discretion when its decision hinges on an error of law, an error of fact, or some other unreasonable basis. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). Finally, under the third step, this court reviews the trial court's determination on whether the probative value of the evidence outweighs the potential prejudice to the defendant under the abuse of discretion standard. *Haygood*, 308 Kan. at 1393. In the end, if the prior bad act evidence is relevant, helps prove a disputed material fact, and is more probative than prejudicial, then this court should affirm the trial court's admission of the prior bad act evidence. 308 Kan. at 1393.

On appeal, Campbell argues (1) that whether he intended to possess the methamphetamine and drug paraphernalia and (2) that whether he intended to use the drug paraphernalia to distribute methamphetamine were not facts in dispute, because his defense was arguing that the State failed to prove its charges against him beyond a reasonable doubt. Concerning his December stop postarrest comments to Deputy Zook about why methamphetamine may be in his car, he argues that the only reason why the jury heard his postarrest comments to the deputy was because the State opened the door itself to admit this otherwise inadmissible evidence. Thus, to properly analyze Campbell's arguments about the trial court's admission of the prior bad acts evidence, we review the law defining a fact in dispute.

In *State v. Graham*, 244 Kan. 194, 196, 768 P.2d 259 (1989), our Supreme Court held that when a defendant's possession of an illegal substance is susceptible to both an innocent and criminal interpretation, then "the intent with which the act was committed becomes the critical element in determining its character." Consistent with this holding, in *Boggs*, 287 Kan. at 314, our Supreme Court held that "when a defendant does not assert that his or her actions were innocent but rather presents some other defense, there is no reason to admit evidence of other crimes or civil wrongs to prove intent." As

19

applied to Boggs' case, this meant the trial court erred when it admitted evidence of Boggs' prior bad acts to prove intent, knowledge, and absence of mistake at his trial for marijuana possession and drug paraphernalia possession. Because Boggs "completely denied ever having possession of the pipe *at all*," it followed that his intent was not a material fact in dispute. 287 Kan. at 315. In reaching this holding, our Supreme Court also stressed that "'[t]he crucial distinction in admitting other crimes evidence under K.S.A. 60-455 on the issue of intent is not whether the crime is a specific or general intent crime but whether the defendant has claimed that his or her acts were innocent.'" 287 Kan. at 314.

In *State v. Prine*, 287 Kan. 713, 728, 200 P.3d 1 (2009), *overruled on other grounds by State v. Dinkel*, 314 Kan. 146, 495 P.3d 402 (2021), our Supreme Court reached a similar holding. There, our Supreme Court held that the trial court erred by granting the State's K.S.A. 60-455 motion to admit Prine's statement to law enforcement that the child-victim may have mistakenly accused him of sex crimes because Prine never put his intent at issue at his trial. In reaching this holding, it repeated the well-known rule that inadmissible evidence may be admitted only when one party opens the door for another party to present the inadmissible evidence. *Prine*, 287 Kan. 713, Syl. ¶ 5, 728; see also *State v. McClanahan*, 259 Kan. 86, 94, 910 P.2d 193 (1996) (holding that a "party cannot open the door for itself to present the inadmissible evidence"). Afterward, it explained why Prine's intent was not a fact in dispute at his jury trial:

> "Here, absence of mistake or accident was not actually in issue in Prine's trial. The State's introduction of evidence about Prine's hypothesis during his law enforcement interview that A.M.C. could have become confused by certain other incidents of nonsexual touching was insufficient to support admission of contrary evidence by the State. *The hypothesis did not inform Prine's position at trial; his defense was a categorical denial that any of the alleged events took place. Under these circumstances, the State could not open the door for itself to put S.M. and J.J.S. on the stand to rebut an innocent explanation advanced by Prine. The evidence it introduced from his interview*

20

*bore no relationship to the defense theory of the case at trial. Admission of the prior sexual abuse evidence to prove absence of mistake or accident was error*." (Emphasis added.) *Prine*, 287 Kan. at 728-29.

Since deciding the preceding cases, our Supreme Court has clarified what constitutes an innocent explanation in *Rosa*. There, Rosa, who had been convicted of possessing methamphetamine, challenged the trial court's admission of his prior drug use under K.S.A. 60-455. But our Supreme Court rejected Rosa's argument because his defense was that he never knew the other people living in his house were "keeping or making methamphetamine." 304 Kan. at 437. It stressed that "Rosa's primary witness called for his defense, Smith, testified—under questioning by Rosa's counsel—that Rosa did not know about his lab, he never told Rosa about the lab, and he never heard anyone in his bedroom having a conservation with Rosa about the lab." 304 Kan. at 437. It held that given Rosa's chosen defense, Rosa made his knowledge about the methamphetamine found in his house a material fact in dispute. It therefore affirmed the trial court's admission of Rosa's prior drug use under K.S.A. 60-455 for the purpose of proving that Rosa knowingly possessed the methamphetamine. 304 Kan. at 437. And the *Rosa* court explained that a defendant's claim that he or she "either was unaware of the presence of the drugs or was under the mistaken belief that the drugs were not illegal drugs but were some other lawful substance" constituted an innocent explanation. 304 Kan. at 437.

So, our Supreme Court's precedent in *Rosa* supports that prior bad act evidence is admissible to prove that a defendant possessed an illegal item only when the defendant places his or her intent to possess the illegal item into dispute. As indicated by *Rosa*'s analysis, a defendant places his or her intent in dispute by offering an innocent explanation for his or her alleged criminal actions. See *State v. Brown*, 44 Kan. App. 2d 344, 352, 236 P.3d 551 (2010). Relying on this rule, this court has previously held that a defendant does not place his or her intent at issue simply by pleading not guilty to the

crimes charged. See *Brown*, 44 Kan. App. 2d at 352; *State v. Roberts*, No. 121,853, 2022 WL 262265, at *4 (Kan. App. 2022) (unpublished opinion).

But in *Brazzle II*, our Supreme Court approved of a different test when considering the trial court's admission of prior bad acts evidence to prove a defendant's possession with intent to distribute. Brazzle argued that the trial court erred by allowing the State to present evidence that he sold methamphetamine to an undercover law enforcement twice about a week before law enforcement found methamphetamine and drug paraphernalia in his car because his intent to distribute was not a material fact in dispute. According to Brazzle, he did not put his intent to distribute in dispute because he never claimed his possession of the methamphetamine was innocent. *State v. Brazzle*, 55 Kan. App. 2d 276, 278, 411 P.3d 1250 (2018) (*Brazzle I*). In *Brazzle II*, our Supreme Court held that although Brazzle presented no evidence, in appealing his drug related convictions Brazzle had put his intent to distribute in dispute for a few reasons: (1) by admitting that intent was at issue in the case, (2) by requesting a lesser included offense instruction on simple possession, and (3) by arguing in closing that "baggies alone were not enough to show that someone intended to distribute." 311 Kan. at 761.

Then, the Supreme Court held that the prior crimes evidence was material to the disputed question of whether Brazzle intended to personally use the drugs or to distribute them because the "similarity between the prior crimes evidence and the evidence of the alleged crime bears on the decision of whether Brazzle intended to distribute the methamphetamine." 311 Kan. at 762. So, in *Brazzle II*, our Supreme Court held that the key determination in whether prior bad acts evidence is material to prove a defendant's intent to distribute is whether the prior bad acts evidence is sufficiently similar to the crimes being charged against the defendant. 311 Kan. at 762; see also *State v. Boggs*, 38 Kan. App. 2d 683, 688, 170 P.3d 912 (2007), *aff'd* 287 Kan. 298, 197 P.3d 441 (2008) (holding that "[w]hen a prior crime is used to show intent, the determination of relevancy must be based on the similarity of the prior crime with the charged crime").

22

Campbell's final alternative argument about the trial court's admission of the evidence from his May stop and July stop encounters with law enforcement is that the prejudicial effect of the prior bad acts evidence greatly outweighed its probative value. In *Boysaw*, our Supreme Court held that the trial court should consider a list of nonexclusive factors when considering the probative verses prejudicial value of the prior bad acts evidence the State seeks to admit. When evaluating the probative value of the prior bad acts evidence, the trial court "should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence." 309 Kan. 526, Syl. ¶ 8. On the other hand, when evaluating the potential prejudicial effect of the prior bad acts evidence, the trial court "should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." 309 Kan. 526, Syl. ¶ 9.

C. *Discussion of error*

1. Campbell's intent to possess and intent to distribute were undisputed

Campbell argues that because his "chosen defense . . . was to present no evidence, to take advantage of his right not to testify, and to hold the State to its burden of proof," it necessarily follows that his intent to possess and his intent to distribute were not facts in dispute at his trial. He asserts that the only reason why his intent was ever in question at his trial was because during its direct examination of Deputy Zook, the State asked the deputy about Campbell's responses to Deputy Zook's questioning following Campbell's arrest on the December stop. He asserts that because the State put his intent into dispute, the State opened the door for itself to admit the prior bad acts evidence. And in making this assertion, Campbell contends that because the State opened the door for itself to

23

admit the prior bad acts evidence, the State forced him to address the prior bad acts in his closing.

The State counters that Campbell made both his intent to possess and intent to distribute facts in dispute at his trial because his defense "was designed to sow doubt as to his intent to distribute the contraband found in his possession." To support this argument, the State cites four things: (1) Campbell's cross-examination of Officer Roberts about finding trace amounts of methamphetamine in his car on the September stop; (2) Campbell's cross-examination of Officer Roberts about not knowing what he was doing immediately before his arrest on the September stop; (3) Campbell's cross-examination of Officer Kennedy about what quantity of methamphetamine was typical for personal use; and (4) Campbell's closing argument that he did not possess distribution level quantities of methamphetamine when arrested on the September stop. The State also cites the fact that the jury was instructed on simple possession of methamphetamine as a lesser included offense of Campbell's possession of methamphetamine with intent to distribute charges as evidence that Campbell's defense placed his intent to possess and intent to distribute into question.

Additionally, the State suggests that Campbell placed his intent at issue because he gave Deputy Zook an innocent explanation why there was methamphetamine and drug paraphernalia in his car following his December stop arrest. Concerning Campbell's argument that it opened the door for itself to admit the prior bad acts evidence, the State's only argument is that Campbell failed to preserve this argument for appeal. It asserts that Campbell cannot complain about it opening the door for the admission of this prior bad acts evidence because he did not move to suppress his postarrest comments to Deputy Zook pretrial and did not object when the deputy testified about his postarrest comments at trial.

24

In his reply brief, Campbell responds that "[t]he State is off base in arguing that [he] did not preserve the argument that the State was wrongly allowed to open the door for its own K.S.A. 60-455(b) evidence." He argues that the State's argument ignores that he did not place his intent at issue. He argues that given this, along with the fact that the State's K.S.A. 60-455 motion was heavily litigated and that he renewed his objection to the admission of the prior bad acts evidence at trial, he preserved his argument for appeal. He further contends that "[i]f vigorous cross-examination and argument geared at creating reasonable doubt on the element of intent are enough to expose the accused to evidence of prior offenses, then the protection afforded by cases like [*Rosa*] is only an illusion."

We note that the only authority the State cites to support its argument that Campbell failed to preserve his argument for appeal is the rule that parties must lodge a specific and timely objection to alleged evidentiary errors. The State does not cite any authority regarding specific measures that a defendant must take to preserve an argument that it wrongly opened the door to the admission of otherwise inadmissible evidence. Meanwhile, Campbell requested and received a continuing objection to the State's discussion of the prior bad acts evidence in its opening arguments. Later on, before Deputy Zook's testimony, he renewed this continuing objection when Officer Kennedy testified about arresting him on the July stop. Then, at the jury instruction conference, Campbell renewed his objection to the admission of the prior bad acts evidence when addressing the State's requested limiting instruction.

In short, because Campbell contested the State's admission of the prior bad acts evidence throughout his case, the State's argument that Campbell somehow waived his K.S.A. 60-455 arguments by not specifically objecting when Deputy Zook testified about his postarrest comments on the December stop is unpersuasive. As Campbell contends, the State's preservation argument ignores that he actively litigated the admission of the prior bad acts evidence. Also, the State's argument ignores that the contemporaneous and

25

specific objection rule under K.S.A. 2021 Supp. 60-404 is a procedural rule that exists to give "'the trial court the opportunity to conduct the trial without using the tainted evidence, and thus avoid possible reversal and a new trial.'" *State v. Hollingsworth*, 289 Kan. 1250, 1257, 221 P.3d 1122 (2009). Here, because Campbell challenged the admission of the prior bad acts evidence multiple times, he gave the trial court multiple opportunities to consider the admission of the prior bad acts evidence under K.S.A. 60-455. Thus, Campbell complied with the underlying purpose of the contemporaneous and specific objection rule despite not explicitly objecting when Deputy Zook testified about his December stop postarrest comments.

For these reasons, we reject the State's request to not consider Campbell's argument about it opening the door for the admission of the prior bad acts evidence. And, in turn, we consider Campbell's underlying arguments that contrary to the State's assertion otherwise, he did not put his intent at issue (1) by pleading not guilty to his charges and (2) by telling Deputy Zook that maybe somebody else left the methamphetamine and drug paraphernalia in his car following his arrest on the December stop.

Regarding the State's assertion that Campbell placed his intent at issue by pleading not guilty to his charged crimes, this assertion directly contradicts this court's holding in *Brown* that a defendant does not place his or her intent in dispute at trial for purposes of admitting K.S.A. 60-455(b) evidence by pleading not guilty. 44 Kan. App. 2d at 352. It also contradicts this court's recent decision in *Roberts*, where this court rejected the State's assertion that Roberts' rejection of a plea offer constituted a claim of innocence that placed Roberts' intent into dispute. 2022 WL 262265, at *4. Therefore, the trial court erred by accepting the State's argument that the prior bad acts evidence was admissible at Campbell's trial because he placed his intent into dispute by pleading not guilty. As noted by this court when rejecting the State's similar argument in *Roberts*, if this court allowed the State to admit prior bad acts every time that a defendant asserts that he or she is not

guilty—either by pleading not guilty or rejecting a plea offer—a defendant's plea of not guilty "would permit the exception in K.S.A. 2020 Supp. 60-455(b) to swallow the general prohibition against admitting prior bad acts evidence in K.S.A. 2020 Supp. 60-455(a)." 2022 WL 262265, at *4.

As to the State's contention that Campbell placed his intent at issue by giving Deputy Zook an innocent explanation, the State's arguments generally focus on whether Campbell gave the deputy an innocent explanation instead of addressing how Campbell's postarrest comments to Deputy Zook entered into evidence. The State apparently wants us to find that Campbell placed his intent at issue because he cross-examined its witnesses, and he presented closing arguments.

The State's admission of Campbell's May stop and July stop encounters with law enforcement hinged on its contention that Campbell gave Deputy Zook an innocent explanation following his December stop arrest. Presumably, when the State moved to admit the prior bad acts evidence before Campbell's trial, the State thought that Campbell's trial defense would involve his alleged innocent explanation to Deputy Zook on December 29, 2017. But Campbell's defense at trial was holding the State to its burden of proof, which resulted in him making no opening arguments and presenting no evidence. It follows that by making no opening arguments and presenting no evidence on his behalf, Campbell could not have opened the door for the State to admit evidence of the prior bad acts. Instead, the State opened the door for itself to admit the prior bad acts evidence when it questioned Deputy Zook about Campbell's December stop postarrest comments during his direct-examination.

Although the State relies on *Rosa* and *Brazzle II* to support its argument that Campbell placed his intent in dispute, the State's reliance on those cases is misplaced. In discussing *Rosa*, the State ignores that the primary factual distinction between Campbell's case and *Rosa* is that Campbell has argued that the State opened the door to admit the

27

otherwise inadmissible prior bad acts. Also, it ignores that in *Rosa*, Rosa's defense, which included calling witnesses on his behalf, was that he did not know about his housemates keeping or making methamphetamine. Thus, the court held the prior bad acts evidence relevant to prove knowledge. *Rosa*, 304 Kan. at 437. In contrast, Campbell's primary defense was that the State had not proven him guilty beyond a reasonable doubt as to any of his charged crimes.

As for the *Brazzle II* decision, its precedent indicates that a defendant may put his or her intent into dispute through argument alone. 311 Kan. at 757, 760-61. Still, when holding that Brazzle put his intent to distribute into dispute, our Supreme Court never suggested that Brazzle's cross-examination of the State's witnesses put his intent into dispute. Rather, our Supreme Court held that Brazzle's intent was in dispute because his counsel conceded so before trial, because Brazzle requested an instruction on possession as a lesser included offense of the distribution charges, and because he argued that the baggies found in his car did not prove his intent to distribute in closing. 311 Kan. at 760-61.

And in those factual ways, Campbell's case is further distinguishable from *Brazzle II*. First, unlike Brazzle, Campbell consistently challenged the admission of the prior bad acts evidence at his trial. In doing so, he explicitly argued that by admitting the prior bad acts evidence, the trial court "put intent in where it doesn't need to be there . . . ." Second, although both Campbell's and Brazzle's juries were instructed on possession as a lesser included offense of their distribution charges, Campbell's case is different from Brazzle because Brazzle requested the lesser included offense instructions. 311 Kan. at 761. Again, in this case, the State requested the lesser included offense instructions on simple possession of methamphetamine. Third, although both Campbell and Brazzle made closing arguments, Campbell's closing arguments focused on whether the State had proven him guilty beyond a reasonable doubt. He explicitly argued that the State had not proven he was guilty of possessing the methamphetamine or drug paraphernalia because

28

the State's evidence left "so many unanswered questions." Fourth, Campbell's arguments about whether the evidence proved solely his intent to possess and not his intent to distribute was his *alternative argument*. Our Supreme Court's *Brazzle II* decision does not indicate that Brazzle's closing argument about whether there was enough evidence to prove his intent to distribute was an alternative closing argument. 311 Kan. at 761.

We note that in its brief, the State latches onto Campbell's alternative closing argument that it only proved possession as opposed to possession with intent to distribute. But in doing so, the State never (1) notes that this was Campbell's alternative argument or (2) notes why Campbell had to present this alternative argument. Campbell argues that he was forced to present this alternative defense because the State "admit[ed] exculpatory hearsay statements through its own witness."

Once more, Campbell litigated this issue before trial. He renewed his objection at trial. Perhaps most tellingly, when Campbell's attorney discussed the prior bad acts evidence during Campbell's closing argument, he attempted to spin the evidence in Campbell's favor. Before comparing the facts of the prior bad acts to the facts of the crimes charged, Campbell's attorney said: "Now, *fortunately*, the State decided that they wanted to put in all this evidence from earlier incidences, which I would submit has very limited utility to you in terms of deciding Mr. Campbell's intent." (Emphasis added.)

But clearly, Campbell's attorney did not believe that his client was fortunate to have evidence of his prior bad acts admitted into his case. Otherwise, he would not have so vehemently contested the admission of the prior bad acts evidence. Campbell's attorney was obviously trying to make the best argument possible for his client under the circumstances of the trial court allowing the State to open the door for itself to admit evidence of his prior encounters with law enforcement that the jury could consider for purposes of evaluating his intent. In such circumstances, it would be fundamentally unfair

29

to punish Campbell for trying to make the best of the fact that the trial court allowed the State to open the door to admission of its own K.S.A 60-455(b) evidence.

Next, although neither party cites our Supreme Court's decision in *Prine*, we find *Prine* to be helpful precedent. The *Prine* court held that although the State had a law enforcement officer testify about Prine's innocent explanation, the State could not rely on its own admission of Prine's innocent explanation to present evidence of Prine's previous sex crimes since Prine's defense did not involve his intent. 287 Kan. at 728-29. In this case, the State has done exactly what it did in *Prine*. The State used its direct examination of Deputy Zook about Campbell's December stop postarrest comments why there was methamphetamine in his car to bring in the prior bad acts evidence against Campbell. Consequently, *Prine*'s precedent strongly supports that Campbell did not place his intent at issue.

Finally, this conclusion is also supported by this court's recent decision in *Roberts*. There, this court rejected the State's contention that Roberts' intent was in dispute based on the State's comparison of Roberts' case to Brazzle's case. In doing so, it explained that the State's reliance on *Brazzle II* was unpersuasive for several reasons, including the following:

> "Unlike Brazzle, Roberts' attorney did not put Roberts' intent at issue in the trial. Roberts presented no evidence. Unlike Brazzle, Roberts did not request the lesser included charge of simple possession—that was done on the State's own initiative. Additionally, in his closing, Roberts' attorney repeatedly discussed the issue of possession and argued the State failed to prove possession." *Roberts*, 2022 WL 262265, at *5.

Simply put, like *Roberts*, Campbell presented no evidence, did not request a lesser included offense instruction, and primarily argued that the State failed to prove his guilt as to any of his charged crimes.

30

To conclude, although the trial court found that Campbell placed his intent at issue by pleading not guilty to the charged crimes, a defendant does not put his or her intent into dispute merely by entering not guilty pleas. So, the trial court erred when it admitted evidence of Campbell's May stop and July stop law enforcement encounters for this reason. And the trial court also erred when it admitted the prior bad acts evidence to dispute Campbell's innocent explanation. Kansas law bars a party from opening the door for itself to present inadmissible evidence. There is no exception to this rule: "[W]hen a defendant does not assert that his or her actions were innocent but rather presents some other defense, there is no reason to admit evidence of other crimes or civil wrongs to prove intent." *Boggs*, 287 Kan. at 314; see *Prine*, 287 Kan. at 728. Here, even if we assume for argument's sake that Campbell gave Deputy Zook an innocent explanation on December 29, 2017, his defense did not involve excusing his behavior. As a result, the trial court erred by allowing the State to open the door to the admission of the prior bad acts evidence.

### 2. Campbell's postarrest December 29, 2017 comments to Deputy Zook were an innocent explanation

In his second alternative argument, Campbell contends that this court should reverse his two methamphetamine possession and four drug paraphernalia possession with intent to distribute convictions because his postarrest December stop comments to Deputy Zook did not constitute an innocent explanation. He argues that because he told the deputy that he did not know about the methamphetamine in his car before suggesting that someone he had given a ride to left it in his car, he flatly denied knowing about the methamphetamine while also offering an "excuse." The State responds that our Supreme Court's precedent in *Rosa* undermines Campbell's contention that he never gave Deputy Zook an innocent explanation on December 29, 2017.

31

The State's reliance on *Rosa* is persuasive. In *Rosa*, our Supreme Court explained that possible innocent explanations would include a defendant's assertion that he or she "was unaware of the presence of the drugs . . . ." 304 Kan. at 437. As a result, by denying knowing about the methamphetamine in his car and by telling Deputy Zook that someone he had given a ride to may have left the methamphetamine in his car, Campbell offered the deputy an innocent explanation. Consequently, under the assumption that Campbell placed his intent at issue through the State's direct examination of Deputy Zook about Campbell's December 29, 2017 innocent explanation, the State could admit the evidence of Campbell's May 21, 2017 and July 18, 2017 encounters with law enforcement for purposes of evaluating the veracity of his December 29, 2017 innocent explanation. Under this limited assumption, the trial court did not err by admitting Campbell's prior bad acts evidence.

> 3. Campbell's postarrest December 29, 2017 innocent explanation to
> Deputy Zook was irrelevant to his September 23, 2017 charges.

Campbell's third alternative argument is that we should reverse his possession of methamphetamine conviction and two possession of methamphetamine with intent to use to distribute convictions stemming from his September stop arrest because he never gave law enforcement an innocent explanation for his September stop arrest. In making this argument, he stresses that when the trial court gave the prior bad acts limiting instruction, it broadly told the jury that it could consider the prior bad acts evidence when evaluating whether he had the intent to commit the September stop and the December stop charges. For this reason, he contends that the State could not admit his May stop and July stop law enforcement encounters for purposes of evaluating his intention to committing the September stop charges. In its brief, the State never directly addresses Campbell's argument about the admission of the prior bad acts evidence for purposes of proving his intent on the September stop, even though Campbell never provided an innocent explanation on September 23, 2017.

32

Once again, in *Boggs*, our Supreme Court held that "when a defendant does not assert that his or her actions were innocent but rather presents some other defense, there is no reason to admit evidence of other crimes or civil wrongs to prove intent." 287 Kan. at 314. Here, even if we were to reject Campbell's contention that the State improperly opened the door for the admission of Campbell's prior bad acts evidence through its direct examination of Deputy Zook, there is no evidence that Campbell gave anyone an innocent explanation for his September stop arrest. Hence, when the trial court gave the jury a limiting instruction that stated it could consider Campbell's prior bad act evidence as to both his September stop and December stop charges, it erred. Because Campbell only gave an innocent explanation for his December stop arrest, his prior bad acts were admissible only to refute that innocent explanation. So there was no reason for the jury to consider the prior bad acts evidence when evaluating the September stop charges.

> 4. Campbell's May 21, 2017 and July 18, 2017 encounters with law enforcement were similar to Campbell's September 23, 2017 and December 29, 2017 encounters with law enforcement.

Campbell's fourth alternative argument is that his May stop and July stop encounters with law enforcement were so unlike his September stop and December stop encounters with law enforcement, that the trial court could not admit evidence of the prior bad acts to prove his possession of drug paraphernalia with intent to use to distribute. Campbell's argument relies on our Supreme Court's *Brazzle II* decision, where it evaluated the materiality of the prior bad acts evidence by comparing the bad acts evidence to the crimes charged. Again, in *Brazzle II*, our Supreme Court held that Brazzle's prior bad acts were sufficiently similar and thus admissible to prove his intent to distribute because the prior bad acts involved Brazzle's methamphetamine sales to undercover law enforcement officers in the same general location just a week before his arrest. 311 Kan. at 760-62. This is consistent with the rule that the trial court should determine relevancy based on the similarity of the prior bad act with the crime charged when the State seeks to admit the prior bad act to show intent. *Boggs*, 38 Kan. App. 2d at

33

688. In his brief, Campbell contrasts his case from *Brazzle II* by stressing that unlike Brazzle, (1) the prior bad acts occurred months before the crimes charged and (2) he was arrested in different locations. Based on these arguments, he asks us to reverse his four possession of drug paraphernalia with intent to use to distribute convictions because the trial court wrongly allowed the jury to consider his May stop and July stop encounters with law enforcement to evaluate whether he intended to use the drug paraphernalia found in his car for drug distribution purposes.

The State does not directly respond to Campbell's argument that the prior bad acts were too dissimilar to admit as evidence that he possessed the drug paraphernalia on his September stop and December stop with the intent to use to distribute drugs. Yet, in addressing the prejudicial verses probative effect of the prior bad acts evidence's admission, the State argues that there are similarities between Campbell's May stop, July stop, September stop, and December stop encounters with law enforcement. It contends that Campbell's prior bad acts and charged crimes occurred within an "extremely short" timeframe. Also, it points out that on each date, "Campbell was charged with possession of methamphetamine with intent to distribute it after methamphetamine, baggies, and scales were found inside the vehicle that he was driving."

The State is correct that there are many similarities between Campbell's prior bad acts and crimes charged. On May 21, 2017, July 18, 2017, September 23, 2017, and December 23, 2017, law enforcement stopped Campbell's car after seeing him drive on a suspended license. In each of those instances, law enforcement developed probable cause to search Campbell's car shortly after making the stop. Then, they found methamphetamine and drug paraphernalia inside Campbell's car.

Although Campbell committed the May 21, 2017 methamphetamine possession with intent to distribute and drug paraphernalia possession with intent to distribute crimes some seven months before the charged crimes on December 29, 2017, our Supreme Court

has previously ruled that longer time frames between bad acts and new crimes charged were sufficiently similar to raise a reasonable inference that the defendant committed the new charges. For example, in *State v. Higgenbotham*, 271 Kan. 582, 583, 23 P.3d 874 (2001), our Supreme Court affirmed the trial court's admission of Higgenbotham's conviction for a murder that occurred 16 months before the murder for which he was currently being charged.

There, the trial court allowed the State to admit evidence of Higgenbotham's other murder conviction to prove Higgenbotham's identity, intent, and plan. 271 Kan. at 589. On appeal, Higgenbotham argued that the trial court erred in admitting evidence of this other murder at his murder trial because it was factually unlike his charged murder. But our Supreme Court rejected Higgenbotham's focus on the dissimilarities between the other murder and the murder charged. It stressed that "[w]hile the crimes were not exactly the same, . . . they were sufficiently similar to raise a reasonable inference that the same person committed both offenses." 271 Kan. at 590. Therefore, our Supreme Court's precedent in *Higgenbotham* supports that when assessing whether a prior bad act is relevant to proving intent, courts should focus on the existence of sufficient similarities, not the differences, between the prior bad act and charged crime.

As just explained, Campbell's May stop and July stop encounters with law enforcement had many similarities to Campbell's September stop and December stop encounters with law enforcement. Hence, although Campbell correctly argues that the encounters occurred several months apart and in different locations, under our Supreme Court's precedent in *Brazzle II* and *Higgenbotham*, his prior law enforcement encounters were sufficiently similar to the crimes charged that his prior encounters were relevant. Thus, under the limited assumption that Campbell placed his intent at issue through the State's direct examination of Deputy Zook about Campbell's December stop innocent explanation, the State could admit Campbell's May stop and July stop encounters with law enforcement to prove that he intended to use the drug paraphernalia found in his car

to distribute drugs. But the analysis of this issue contemplates something more than just the admissibility component.

### 5. The prejudicial effect of the admission of the prior bad acts was not considered.

In his final alternative argument, Campbell contends that the prejudicial effect of the admission of his May stop and July stop law enforcement encounters substantially outweighed the probative value of its admission. In making this argument, Campbell asserts that because he never put his intent to possess or to distribute in dispute, there was no probative value to the admission of the prior bad acts evidence. He also argues that the admission of the prior bad acts evidence prejudiced him because it encouraged the jury to convict him based on his propensity to commit crimes.

In its response, the State admits that the trial court did not explicitly reference the *Boysaw* factors for weighing whether the prejudicial effect of prior bad acts evidence outweighed its probative value. But it points out that our Supreme Court has previously held that reversible error does not necessarily result when the trial court fails to weigh the probative value verses the prejudicial effect of the prior bad acts evidence on the record. *State v. Claerhout*, 310 Kan. 924, 931, 453 P.3d 855 (2019). Relying on this authority, it asks this court to consider whether the trial court's failure to weigh the probative value verses the prejudicial effect of the prior bad acts evidence was harmless.

Yet, by making this argument, the State implicitly concedes that the trial court's probative verses prejudice analysis was erroneous. The record supports this concession since the trial court's analysis concerning the prejudicial effect of the prior bad acts evidence was limited to two conclusory statements that the risk of prejudice to Campbell did not outweigh the prior bad acts evidence's probative value. Accordingly, the trial court erred by failing to evaluate on the record the probative verses prejudicial effect of

the admission of the prior bad acts evidence involving Campbell's May stop and July stop law enforcement encounters.

Because Campbell has established that the trial court erred by granting the State's motion to admit evidence of his May stop and July stop law enforcement encounters for purposes of establishing his intent and for evaluating the veracity of his innocent explanation, we consider the prejudicial effect of this error in our cumulative error analysis further below. See *State v. Smith-Parker*, 301 Kan. 132, 163, 340 P.3d 485 (2014); *State v. Conaway*, No. 121,848, 2021 WL 4704029, at *5 (Kan. App. 2021) (unpublished opinion), *rev. denied* 314 Kan. 856 (2022); and *State v. Genzel*, No. 120,602, 2020 WL 3481499, at *7 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 896 (2020) (all deferring consideration of prejudice until addressing the defendant's cumulative error argument when the record revealed multiple errors).

## DID THE PROSECUTOR COMMIT ERROR WHEN DISCUSSING A DEFENDANT'S PRESUMPTION OF INNOCENCE?

Campbell's next contention of error generally consists of a claim that the prosecutor crafted a hypothetical scenario during voir dire which compromised his right to a fair trial. The more specific facets of his issue are that the challenged remarks: (1) diluted his presumption of innocence; (2) created the risk for a verdict driven singularly by emotion; and (3) minimized the State's burden of proof. Campbell asserts the error necessitates reversal of his convictions because it is not possible to deem it harmless.

The State counters that the complained of hypothetical was simply a tool implemented by the prosecutor to assist members of the jury pool in understanding Campbell's right to the presumption of innocence. But to the extent it falls within the ambit of error it is properly classified as harmless.

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To determine whether prosecutorial error occurred, the court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that offends the defendant's constitutional right to a fair trial. If the prosecutor erred, we must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, the court applies the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109. In examining the prosecutor's statements, we read those statements in context rather than in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018).

Campbell directs us to the following remarks made by the State during voir dire as the foundation for his claim of error:

> "In a criminal case, a defendant is always presumed innocent. If I walked up to the court reporter right now and slapped her across the face in front of all of you, I have the right to have a jury trial, and I am presumed innocent. Does anybody here have a problem with that concept? I see no hands."

Through the use of little more than a paragraph in his brief, comprised largely of conclusory statements accompanied by minimal, if any, corresponding substantive argument, Campbell urges us to validate his claim of reversible error. He contends the remarks "undermined [his] presumption of innocence, rather than explaining it," and "also risked pushing the jury toward an emotional decision by implicitly lumping [him]

together" with the person from the hypothetical who committed a crime in a crowded room.

We decline to assign error to the complained of remarks. As a reviewing court, it is our responsibility to analyze the challenged statements within their proper context, rather than in isolation. See *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018) (When reviewing statements made by prosecutors, the context of the challenged statements matters.). This case offers a fine illustration of why that analytical tool is so important to resolution of these types of issues. To do otherwise here would be to leave half the story untold.

The voir dire transcript reflects that shortly before the hypothetical was uttered, a venire person expressed concern to the prosecutor and the court because given they were an engineer and not a member of the legal profession, they did not understand a fair amount of the terminology used by the parties. In an effort to put the individual at ease, the court explained that was likely the case for an appreciable portion of the pool and advised counsel to "be sensitive to that with regard to phrases and words" as they proceeded with the remainder of jury selection.

Immediately thereafter, the prosecution implemented the hypothetical, without objection, for what we view as a tool to assist the jury in understanding Campbell's right to a presumption of innocence. Following the challenged statements, the State went on to explain that as "ridiculous" a request as it would be, if they were asked to assess Campbell's guilt without hearing any evidence, the presumption of innocence mandated a finding of not guilty. Thus, what our review of this case reveals is a prosecutor who followed the directive of the district court and endeavored to provide a very rudimentary example of a criminal defendant's right to be cloaked in the presumption of innocence when they enter the courtroom regardless of the circumstances of their case.

39

Our Supreme Court was tasked with resolution of a similar issue in *State v. Robinson*, 303 Kan. 11, 363 P.3d 875 (2015) *overruled on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017). In that case, Robinson argued that the prosecutor's hypothetical questions during voir dire shifted the State's burden of proof and undermined his presumption of innocence. Because Robinson's death penalty case had received pretrial publicity, some prospective jurors raised concerns about "their ability to set aside" information they heard as a product of that publicity. 303 Kan. at 271. The prosecutor responded by posing the following hypothetical question: "'[A]ssuming the prosecution did a horrible or bad job presenting the case and you had serious doubts that the State had met its burden, how would you vote, or would you vote to acquit?'" 303 Kan. at 272. On appeal, Robinson argued the hypothetical rose to the level of prosecutorial error because it implied that acquittal was only appropriate if the prosecutor did a horrible job in presenting its case.

Our Supreme Court rejected Robinson's claim and declined to find that the question either altered the State's burden of proof or undermined his presumption of innocence. It offered the following explanation in support of its ruling:

> "The prosecutor phrased the question as a hypothetical scenario for the purpose of establishing panelists' willingness and ability to set aside media facts and opinions formed as a result of exposure to them. The question was particularly appropriate, given that the entire purpose of small group voir dire during the second phase of jury selection was to explore potential bias created by exposure to pretrial publicity and panelists' death penalty views. Throughout the voir dire process, the prosecutor emphasized the applicable evidentiary burdens and legal presumptions to venire members. Viewing the voir dire record in its entirety, we hold the remarks were not misconduct." 303 Kan. at 272.

For similar reasons, the remarks at issue here likewise cannot be classified as erroneous. During voir dire a number of prospective jurors openly expressed their

inability to fully understand the terminology attendant to criminal proceedings. In response to the court's recommendation that the process or dialogue be simplified for the benefit of the venirepersons, the State presented an exceptionally fundamental explanation of the presumption of innocence. The purpose of voir dire is to enable the parties to select jurors who are competent and who could serve without bias, prejudice, or partiality. *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015). Like *Robinson*, the prosecutor's hypothetical here was designed to achieve that level of competency. Also like *Robinson*, the prosecutor here took affirmative steps during the voir dire process to emphasize the applicable evidentiary burdens and legal presumptions to venire members. Viewing the voir dire record before us in its entirety, we decline to find the challenged remarks constituted error.

While we have no reservation in concluding the statements here fell within the wide latitude afforded prosecutors in presenting their case to the jury, any error that may be attributed to the challenged statements is properly characterized as harmless as nothing in the record suggests there is a reasonable probability the error contributed to the outcome. "When assessing prejudice, '[t]he focus of the inquiry is on the impact of the error on the verdict.'" *State v. Bodine*, 313 Kan. 378, 411, 486 P.3d 551 (2021). Our review reflects the jurors returned a verdict that was, in large measure, favorable to Campbell. Of the nine charged offenses, it arrived at a finding of guilt for the lesser offense on the two highest counts, and acquitted Campbell of three other charges. We interpret that to mean the jurors scrupulously honored Campbell's presumption of innocence and firmly held the State to its burden of proof. The court instructed the jury orally and as part of its written packet of instructions that the State carries the burden to prove Campbell is guilty beyond a reasonable doubt and that the jury must presume he is not guilty unless the evidence convinces them otherwise. Their verdict illustrates respect for and adherence to those instructions. Accordingly, we reject Campbell's contention that this issue warrants reversal of his convictions.

The dissent expresses considerable concern and frustration with the State's hypothetical. That dissatisfaction yielded an extensive analysis of approximately six different theories to establish how, from the dissent's perspective, the prosecutor's imagery had a pervasively adverse impact on Campbell's right to a fair trial.

We share the dissent's position that we are vested with the obligation to steadfastly ensure that cases are prosecuted within the bounds of fairness to which criminal defendants are entitled. Nevertheless, we refrain from undertaking a substantive counter-analysis of each of the dissent's theories of prejudice because they do not align with the very limited challenges advanced by Campbell. Rather, they are primarily independent contentions raised and analyzed by our esteemed colleague. To do otherwise would run contrary to the sound, long-standing rule that issues not briefed by the parties are deemed abandoned. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020). Thus, they are not presented in a posture through which they can effectively be decided. "The premise of our adversarial system is that appellate courts . . . sit . . . as arbiters of legal questions presented and argued by the parties before them." *National Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10, 131 S. Ct. 746, 178 L. Ed. 2d 667 (2011).

> "[A]n appellate court sits as a court of review . . . . It is not the function of the appellate court to serve as advocate for any party to an appeal. That is the function of counsel. It would be unfair to the parties if it were otherwise. That is the reason for the sometimes-expressed unwillingness of an appellate court to assume the role of counsel and advocate for a party on appeal." *Hoskinson v. Heiman*, No. 122,120, 2021 WL 2282688, *3 (Kan. App. 2021) (unpublished opinion).

In prosecutorial error cases "it 'is not enough that [the State's] remarks were undesirable or even universally condemned.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). The decision must still be made whether the challenged remarks "'so infected the trial with unfairness as to make the resulting [convictions] a denial of due process.'" 477 U.S. at 181, quoting, *Donnelly v.*

42

*DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). As noted above, we are unable to conclude that the prosecutor uttered erroneous statements and that Campbell likewise successfully cleared the hurdle to establish that he suffered prejudice as a result of the hypothetical. Campbell was not denied the fair trial or constitutional protections to which he is entitled for this reason.

### DID THE TRIAL COURT ERR BY REVERSING ITS INITIAL RULING GRANTING CAMPBELL'S SUPPRESSION MOTION?

Campbell contends that the trial court erred when it granted the State's motion to reconsider its original order suppressing all the evidence found during the December stop. He argues that the trial court abused its discretion because it gave the State a second chance to relitigate an issue it had already lost. He asserts that because its initial ruling granting his suppression motion was a valid interpretation of the plain language of the GPS search warrant, the trial court was prohibited from reconsidering its ruling granting the suppression motion. The State counters that Campbell has failed to preserve his argument for appeal and that the trial court's decision to grant its motion to reconsider was reasonable under the facts of Campbell's case.

In *State v. Wilson*, No. 114,203, 2016 WL 1169487, at *4 (Kan. App. 2016) (unpublished opinion), a panel of this court explained that a "motion to reconsider is generally not a creature of statute, but of caselaw." Because Kansas caselaw lacked developed standards for evaluating reconsideration motions, however, the *Wilson* panel had to look to Federal cases in Kansas for guidance on how to analyze a trial court's motion to reconsider ruling. From this caselaw, the *Wilson* panel synthesized the following three rules:  (1) that the decision to grant or deny a motion to reconsider is committed to the trial court's sound discretion, (2) that a motion to reconsider is not a second chance for a losing party to make its strongest argument, and (3) that a motion to reconsider is not an opportunity to relitigate issues the trial court previously rejected. It

explained that instead, a motion to reconsider should be limited to circumstances like when the trial court has misapprehended the facts, a party's position, or the law. 2016 WL 1169487, at *4-5.

Regardless of whether Campbell has preserved his argument for appeal, his underlying complaint about the trial court granting the State's motion to reconsider is unpersuasive.

The trial court originally suppressed the evidence seized from Campbell's car on December 29, 2017, because it found that the GPS search warrant had expired as of that date. In doing so, it relied on the fact that the plain language of the GPS search warrant stated that it expired on December 28, 2017. At the same time, it rejected the State's argument that the disputed evidence was admissible because the GPS search warrant had expired due to Officer Kennedy's clerical error in the affidavit requesting a 30-day extension for the warrant. In reaching this ruling, the trial court considered the GPS search warrant and Officer Kennedy's request for a 30-day extension of the warrant, which the State had admitted into evidence. And after reviewing those documents, it agreed that Officer Kennedy and the trial court granting the 30-day GPS warrant extension had made a mistake. Still, without further explanation, it granted Campbell's motion to suppress. Later, after hearing Officer Kennedy's explicit testimony that she made a clerical error, the trial court granted the State's motion to reconsider its earlier decision granting Campbell's suppression motion.

In this case, it is undisputed that the trial court granted law enforcement's request for a 30-day extension of the GPS search warrant on December 27, 2017. In granting this extension, the trial court relied on Officer Kennedy's affidavit. But in this affidavit, Officer Kennedy said that law enforcement needed "a 30 day extension of the current search warrant, which is set to expire on Thursday, November 28th, 2017." When the trial court granted Officer Kennedy's warrant extension request, it relied on Officer

Kennedy's specific request. As a result, on December 27, 2017, the trial court extended the GPS search warrant for "30 days from the expiration date on the previous search warrant, November 28th, 2017 . . . ." Thirty days from November 28, 2017, was December 28, 2017. So, under the plain language of the extension, the trial court entered an order on December 27, 2017, that extended the GPS search warrant until December 28, 2017.

Campbell's argument on appeal is that the trial court should not have granted the State's reconsideration motion because its original interpretation of the 30-day extension to the GPS search warrant correctly interpreted its plain language. But Campbell's argument ignores that the plain language of the 30-day extension created an unreasonable result: It resulted in the GPS search warrant expiring on December 28, 2017, even though the trial court granted a 30-day extension of the GPS search warrant on December 27, 2017.

This court's *Wilson* decision supports that the trial court has discretion to grant a motion to reconsider when it misapprehended the facts, a party's position, or the law. 2016 WL 1169487, at *5. Here, the trial court's original decision granting Campbell's suppression motion was contrary to the law. K.S.A. 22-2511 states that "[n]o search warrant shall be quashed or evidence suppressed because of technical irregularities not affecting the substantial rights of the accused." Also, courts must interpret language disputed by parties in a way to avoid unreasonable results. See *State v. Ultreras*, 296 Kan. 828, 844, 295 P.3d 1020 (2013) (explaining that when interpreting statutes, courts must avoid construing language in a way that leads to unreasonable results). The plain language of Officer Kennedy's affidavit supporting the 30-day extension of the GPS search warrant and the trial court's order extending the GPS search warrant clearly established that it was the trial court's intention to extend the GPS search warrant 30 days from December 28, 2017. Those documents' plain language clearly established that the order extending the GPS search warrant contained a clerical error.

45

Because no evidence should be set aside based on technical irregularities under K.S.A. 22-2511, it necessarily follows that the trial court did not abuse its discretion by granting the State's reconsideration motion. This was something that the trial court needed to do to correct its previous mistaken decision to grant Campbell's suppression motion based on an unreasonable interpretation of the trial court's order extending the GPS search warrant for 30 days. Given the preceding, at Campbell's new trial for the two possession of methamphetamine charges and four possession of drug paraphernalia with intent to use to distribute charges, the State may present evidence of the items seized from his car on December 29, 2017.

*There is no evidence of cumulative error in Campbell's case*

In his final issue, Campbell seeks to have his convictions reversed under the theory that his trial was tainted by cumulative error.

In some cases, the cumulative effect of errors at trial may indeed require reversal of the defendant's conviction. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). In considering whether cumulative error requires reversal, we consider whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. However, reversal under such a theory is not warranted if there has been only one error at trial as we have found in here. See *State v. Bowser*, 312 Kan. 289, 308-09, 474 P.3d 744 (2020).

Reversed and remanded for a new trial.

* * *

GREEN, J., concurring in part and dissenting in part:  I concur in the majority's decision in all respects except as to its analysis that no prosecutor error was committed by

46

the State in Jerry W. Campbell's trial. As a result, I respectfully dissent from the majority's decision on this issue.

The majority opinion sets a far too low bar for prosecutorial error. The basic flaw in the majority analysis is that it has fallen prey to the logical fallacy of a false equivalence contained in the prosecutor's hypothetical.

The majority acknowledges in its opinion that Campbell specifically claimed that the prosecutor's hypothetical:  "(1) diluted his presumption of innocence; (2) created the risk for a verdict driven singularly by emotion; and (3) minimized the State's burden of proof." The basic presumption of innocence is one of the great principles embedded in our Anglo-American justice system.

Nevertheless, the majority attempts to build a protective hedge around the prosecutor's flawed hypothetical by lecturing the dissent on this court's standard of review. Indeed, the majority contends that the dissent goes too far in explaining how the prosecutor's hypothetical would have confused the prospective jurors about their duty to presume Campbell innocent at all stages of his trial and to place the burden on the State to prove his guilt beyond a reasonable doubt. The majority also ignores that when the prosecutor drafted Campbell into her hypothetical as a defendant, this would have inflamed the prospective jurors against him by planting a seed into their minds:  That he is someone who would have no qualms about walking up to a defenseless court reporter and slapping her across her face in a courtroom full of witnesses and then have the audacity to claim his innocence and demand a jury trial.

Here, the majority insists that Campbell suffered no prejudice because of the hypothetical. I disagree. The prosecutor's hypothetical and the majority's reasonings are flawed. What is flawed cannot be made sound. And what is lacking cannot be depended on.

The prosecutor's discussion of a defendant's presumption of innocence with the prospective jurors was as follows:

> "[THE PROSECUTOR:] *In a criminal case, a defendant is always presumed innocent. If I walked up to the court reporter right now and slapped her across the face in front of all of you, I have the right to have a jury trial, and I am presumed innocent.* Does anybody here have a problem with that that concept? I see no hands.
>
> "[M.K.]. If you had to decide this case right now—which is a ridiculous hypothetical; right?—but you haven't heard any evidence, how would you have to decide?
>
> "PROSPECTIVE JUROR [M.K.]: That's tough.
>
> "[THE PROSECUTOR]: [J.S.], what would you have to decide? You haven't heard any evidence, so what—how do you have to decide?
>
> "PROSPECTIVE JUROR [J.S.]: What evidence do I go by?
>
> "[THE PROSECUTOR]: Well, no. At this point in the game, you haven't heard any evidence. And if I said right now you had to decide, you'd have to find Mr. Campbell not guilty. Wouldn't you. Because that's where he starts off.
>
> "PROSPECTIVE JUROR [J.S.]: Right.
>
> "[THE PROSECUTOR]: He starts off innocent—not guilty—unless and until the State proves, beyond a reasonable doubt, that he's guilty." (Emphasis added.)

*Applicable law*

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018); see also *State v. McBride*, 307 Kan. 60, 64-65, 405 P.3d 1196 (2017) (statements during closing argument).

"'[A] prosecutor's improper comment or argument can be prejudicial, even if the [error] was extemporaneous and made under the stress of rebutting arguments made by

48

defense counsel.'" *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct); see also *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015) (stating the "'open-the-door rule does not insulate a prosecutor from a finding of misconduct'" when responding to defense arguments).

When analyzing prosecutorial error claims, this court uses a two-step test. Under the first step, this court "'must decide whether the prosecutorial acts complained of [fell] outside the wide latitude afforded prosecutors to conduct the State's case.'" *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021). Then, assuming error is found under this first step, under the second step, this court determines whether the error prejudiced the defendant's constitutional right to a fair trial. For an error to be harmless under this step, the State must prove beyond a reasonable doubt that the error had no impact on the outcome of the defendant's trial in light of the entire record. 313 Kan. at 428.

In considering prosecutorial error challenges, our Supreme Court has consistently held that some prosecutorial acts constitute error under the first step of this court's review. For instance, our Supreme Court has consistently held that a prosecutor's argument that dilutes the State's burden of proof constitutes error. *State v. Thomas*, 307 Kan. 733, 743, 415 P.3d 430 (2018); *State v. Holt*, 300 Kan. 985, Syl. ¶ 4, 336 P.3d 312 (2014). It has repeatedly held that a prosecutor is not allowed to make statements that inflame the passions and prejudices of the jury. *State v. Bodine*, 313 Kan. 376, 406, 486 P.3d 551 (2021); *State v. Bennington*, 293 Kan. 503, 532, 264 P.3d 440 (2011). Likewise, it has repeatedly held that a prosecutor's misstatement of the law constitutes error. *State v. Robinson*, 303 Kan. 11, 324, 363 P.3d 875 (2015); see *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). All the same, our Supreme Court has held that the context of the prosecutor's disputed action matters. *Thomas*, 307 Kan. at 744. This means that when assessing a prosecutor's action for error, this court must consider the disputed action in context rather than in isolation. 307 Kan. at 744.

A defendant's presumption of innocence is a fundamental constitutional right guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. See *State v. Ward*, 292 Kan. 541, 543, 256 P.3d 801 (2011) (discussing a defendant's constitutional right to his or her presumption of innocence). In *Robinson*, our Supreme Court considered Robinson's argument that the prosecutor's hypothetical question during voir dire shifted the State's burden of proof and undermined his presumption of innocence. 303 Kan. at 271-72. Because Robinson's death penalty case had received pretrial publicity, some prospective jurors raised concerns about "their ability to set aside pretrial publicity." 303 Kan. at 271. The prosecutor responded by asking a hypothetical question: "'[A]ssuming the prosecution did a horrible or bad job presenting the case and you had serious doubts that the State had met its burden, how would you vote, or would you vote to acquit?'" 303 Kan. at 272. Robinson challenged this hypothetical because he "believe[d] the prosecutor implied that acquittal would be proper only if the prosecutors did a horrible job presenting the case." 303 Kan. at 272. Our Supreme Court rejected Robinson's argument that this hypothetical question shifted the State's burden of proof or undermined his presumption of innocence.

*Discussion of error*

In the prosecutor's "ridiculous hypothetical"—the supposed case—she asked the prospective jurors in advance whether they would have a problem with her asserting her presumption of innocence—that is, making the State prove that she battered the court reporter beyond a reasonable doubt—after they saw her slap the court reporter in the face. So, under the prosecutor's fictitious hypothetical, she asked the prospective jurors in advance if they had a problem with the concept of her claiming that she was innocent even though they had just witnessed her intentional conduct of slapping the court reporter.

The prosecutor's ridiculous hypothetical had five harmful effects.

50

First, the prosecutor's ridiculous hypothetical improperly called for a prejudgment on a supposed set of facts. Also, her extreme hypothetical contrasted Campbell's presumption of innocence, to which he is entitled at all stages of trial, against what the prosecutor described, in her own words, as "a ridiculous hypothetical"—her slapping the court reporter across her face in front of all the prospective jurors.

Voir dire examination is designed to test the competency and impartially of prospective jurors. Here, the prosecutor's imaginary ridiculous hypothetical would not have reasonably been expected to result in an answer bearing on the qualifications of a prospective juror. To the contrary, the prosecutor's hypothetical called for a prejudgment on the supposed set of facts. Indeed, the prosecutor asked a prospective juror, M.K., to prejudge a supposed set of facts under her hypothetical when she asked M.K. the following question: "If you had to decide this case right now—which is a ridiculous hypothetical; right?—but you haven't heard any evidence, how would you have to decide?" Thus, the prosecutor's ridiculous hypothetical was designed to elicit a commitment from the prospective jurors to prejudge the supposed set of facts based on her hypothetical.

Questions as to what prospective jurors would do or not do under the supposed set of facts are improper. *State v. Bracey*, 303 N.C. 112, 119, 277 S.E.2d 390 (1981) (A trial court should not allow questions to prospective jurors as to the kind of verdict that they would render on a given state of facts.); see also *State v. Clark*, 164 Conn. 224, 226, 319 A.2d 398 (1973) (hypothetical questions intended to elicit from prospective jurors what their decision will be under a certain state of the evidence or upon a certain state of facts should not be allowed by the trial court); *Fish v. Glass*, 54 Ill. App. 655, 659 (1894) (It is improper to ask prospective jurors during voir dire examination what they would do based on certain stated facts.); *State v. Clark*, 325 So. 2d 802, 806-07 (La. 1976) (Hypothetical questions and questions of law are not allowed in the examination of prospective jurors which call for a prejudgment of any supposed set of facts.); *State v.*

51

*Banik*, 21 N.D. 417, 131 N.W. 262, 262-63 (1911) (The trial court properly sustained objections to questions propounded to prospective jurors, where the examiner assumes the facts in the case to determine the prospective jurors' opinion in advance.); and *State v. Krutzfeldt*, 53 S.D. 435, 435, 221 N.W. 53 (1928) (No error by the trial court in refusing to allow a number of hypothetical questions to be propounded to a prospective juror and asked what his verdict would be under a supposed set of facts.).

Second, the prosecutor's ridiculous hypothetical mixed the roles of the prospective jurors as impartial fact-finders with that of eyewitnesses to a crime in a very confusing way. For example, under her hypothetical, the prosecutor initially told the prospective jurors to fix their eyes on her crime of slapping the court reporter in front of them to explain the concept of the presumption of innocence. Nevertheless, without saying so in her hypothetical, the prosecutor switched herself as the defendant and replaced Campbell as the defendant. How do we know this? Because when she explained why prospective jurors, M.K. and J.S., gave the incorrect answer to her hypothetical question, the prosecutor said: "Well, no. At this point in the game, you haven't heard any evidence. And if I said right now you had to decide, you'd have to find Mr. Campbell not guilty. Wouldn't you[?]"

Why would the prosecutor portray herself as the defendant under her ridiculous hypothetical and then draft Campbell into her hypothetical as the criminal defendant? This is because the prosecutor's extreme hypothetical is based on a logical fallacy called a false equivalence. For example, this occurs when someone incorrectly contends that two or more things are equivalent simply because they share a characteristic, but when in fact there are significant differences between them. See *False Equivalence*: *The Problem with Unreasonable Comparisons*, https://effectiviology.com/false-equivalence. In this case, the shared characteristic between the prosecutor and Campbell is in the prosecutor's hypothetical. For example, the prosecutor and Campbell are both mentioned as defendants under the prosecutor's hypothetical, but that does not make them the same.

False equivalences are often used together in conjunction with an *ad hominin* fallacy. A common *ad hominin* technique is to raise questions about a person's life, such as his or her moral fitness, or trustworthiness. In this case, the prosecutor may have drafted Campbell into her ridiculous hypothetical to inflame the prospective jurors against him by planting a seed into their minds that her hypothetical reflected Campbell's character:  a person completely devoid of any common decency who would have no qualms about walking up to a defenseless court reporter and slapping her across her face in a courtroom full of witnesses and then have the audacity to claim his innocence and demand a jury trial.

When the prosecutor substituted Campbell into her role under her hypothetical, she signaled to the prospective jurors that Campbell's case was like her ridiculous hypothetical, telegraphing that there was overwhelming evidence of Campbell's guilt in his case like the overwhelming evidence of her guilt based on the supposed facts of her hypothetical—slapping the court reporter in full view of the prospective jurors. The prosecutor's hypothetical, however, was pure sophistry. It suggested to the prospective jurors that as there was overwhelming evidence of her guilt under her hypothetical, the State had the same kind of overwhelming evidence against Campbell. Thus, the prosecutor's ludicrous hypothetical would have watered down Campbell's presumption of innocence in the eyes of the prospective jurors.

Besides, all the prospective jurors in the prosecutor's ridiculous hypothetical would have been ineligible to serve as jurors on the prosecutor's hypothetical jury because they would have been challenged for cause under K.S.A. 22-3410(2). A bed rock principle of our jury system is that a juror would never knowingly be allowed to serve as juror if he or she had direct knowledge about the facts of the case or about the parties to be tried. See K.S.A. 22-3410(2)(i) (a prospective juror may be challenged for cause if his or her state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he or she can act impartially and without prejudice to the

53

substantial rights of any party). Also, a witness to a crime could never serve as a juror in a trial that he or she had witnessed. See K.S.A. 22-3410(2)(g) (a prospective juror may be challenged for cause if he or she was a witness to the act or acts alleged to constitute the crime).

Third, the majority contends that the prosecutor's ridiculous hypothetical was "an exceptionally fundamental explanation of the presumption of innocence." Nevertheless, the prosecutor's false hypothetical was confusing as previously illustrated by the prosecutor's exchanges with prospective jurors M.K. and J.S. Moreover, the absurd hypothetical did not prove the probability that the prospective jurors would conclude that Campbell was not guilty under the prosecutor's hypothetical. Indeed, the prosecutor had to prompt prospective juror J.S. before J.S. acknowledged that Campbell would not be guilty under her hypothetical. Thus, in professing to explain to the prospective jurors the presumption of innocence standard, the prosecutor instead confused them with her inept hypothetical.

Indeed, the prosecutor's ridiculous hypothetical is comparable to an actual episode that occurred this year at the Hollywood Oscars ceremony. Like the factual situation described in the prosecutor's hypothetical, a Hollywood actor intentionally slapped a comedian on stage in front of the Oscars' audience and viewers of the show. Obviously, if the audience and the viewers of the show had been asked about the actor's presumption of innocence, if he had been charged with criminal battery, there would be a very high probability that the opinions of the audience and the viewers of the show would be very much in doubt over the actor's presumption of innocence. Here, the lack of *probability* of the prospective jurors arriving at the correct answer under the prosecutor's foolish hypothetical occurred because she made the prospective jurors a witness to the criminal offense—her slapping the court reporter in front of them. And therefore, the prosecutor's hypothetical was fatally prejudicial in helping to explain the presumption of innocence to the prospective jurors. Thus, the concept of the defendant's presumption of innocence

54

suddenly evaporates when the prospective jurors are witnesses to the defendant's criminal offenses.

Fourth, the prosecutor's ridiculous hypothetical planted a seed in the minds of the prospective jurors that the State had direct evidence of Campbell's drug-related offenses. Direct evidence is "evidence which, if believed, proves the existence of a fact without inference or presumption, as for example the testimony of an eyewitness as to what he or she actually saw, heard, or touched." *State v. Scaife*, 286 Kan. 614, 620, 186 P.3d 755 (2008). Meanwhile, circumstantial evidence is evidence that "'tends to prove a fact in issue by proving other events or circumstances which afford a basis for [a] reasonable inference by the jury of the occurrence of the fact in issue.'" *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). Here, the prosecutor implied that Campbell was just as guilty of the drug-related charges as she would have been of battery if she had slapped the court reporter in front of the entire jury panel once chosen. Nevertheless, the State's case hinged entirely on circumstantial evidence. Unlike the supposed case of the prosecutor slapping the court reporter, the State had no direct evidence of Campbell's guilt. It certainly did not have 12 eyewitnesses to the charged crimes. Indeed, this is seemingly why the prosecutor relied so heavily on the admitted prior bad acts evidence because there was no direct evidence that Campbell had the intent to possess or to distribute the drug-related items found in his car on September 23, 2017, and December 29, 2017. And after making this confusing hypothetical, the prosecutor never clarified to the potential jurors and to the jury that the State had no direct evidence of Campbell's guilt. Thus, the prosecutor also erred in using this hypothetical because it wrongly planted in the minds of the potential jurors that the State's case against Campbell was open and shut even though it had not put on any evidence of his guilt.

Fifth, based on the previously mentioned factors one through four, the prosecutor's ridiculous hypothetical would have diluted the presumption of innocence—to which Campbell was entitled at all stages of trial—in the eyes of the prospective jurors because

55

they were actual witnesses to the crime being committed under the prosecutor's hypothetical.

Although the State correctly points out that the *Robinson* decision addressed a prosecutor's hypothetical about a defendant's presumption of innocence during voir dire, the specific hypothetical at issue in *Robinson* is different than the ridiculous hypothetical Campbell currently challenges. Once more, in *Robinson*, the hypothetical at issue occurred when the prosecutor was discussing Robinson's pretrial publicity. In that context, the prosecutor asked the prospective jurors whether they would acquit Robinson of murder if the State "did a horrible or bad job presenting the case and [they] had serious doubts that the State had met its burden." 303 Kan. at 272. But here, the prosecutor presented a hypothetical asking the prospective jurors if they had a problem with her claiming her presumption of innocence after they witnessed her intentionally slap the court reporter's face. Thus, the prosecutor here was not asking the prospective jurors whether they would acquit Campbell if they had doubts based on her poor prosecution of the State's case. Rather, the prosecutor asked the prospective jurors if they had a problem with defendants asserting their presumption of innocence at a jury trial even though the prospective jurors had witnessed those defendants commit the crimes for which they are being tried. So the prosecutor's hypothetical in this case is far more extreme than the prosecutor's hypothetical in *Robinson*.

*Closing argument*

Additionally, in her closing argument, the prosecutor argued to the jury the following: "There has been no evidence—you didn't hear any evidence that Jerry Campbell is a user of methamphetamine. The only evidence that you have heard is that he is a distributor or seller of methamphetamine." Then, the prosecutor repeated this argument in her rebuttal closing: "Again, there are several counts where you have to— you're being asked to decide the defendant's intent, whether it was for distribution or use.

And I submit to you there is no evidence of use." The prosecutor here planted suspicion in the minds of the jury that Campbell had the burden of introducing evidence of his personal use of methamphetamine to create a reasonable doubt of his guilt before he could be found not guilty as a distributor. As a result, the prosecutor's argument was tantamount to telling the jury that Campbell had the burden of proving his innocence.

For prosecutorial errors, this court considers whether the State has proven that the prosecutor's error was harmless beyond a reasonable doubt in light of the entire record. *State v. Haygood*, 308 Kan. 1387, 1398, 430 P.3d 11 (2018).

Although the State argues that the prosecutorial error was harmless because the evidence against Campbell was overwhelming, it also argues that this court should affirm Campbell's convictions because the jury's verdicts support the errors were harmless. But these arguments contradict each other. If the evidence against Campbell was overwhelming, then it follows that the jury would have convicted Campbell as charged. It would not have acquitted Campbell of possessing diazepam, possessing buprenorphine, and child endangerment. Similarly, if the evidence was overwhelming, it would not have convicted Campbell of simple possession as a lesser included offense of the two possessing methamphetamine with intent to distribute charges. Plainly, because the jury convicted Campbell of simple possession of methamphetamine, it must have had doubts about Campbell's intent to distribute that methamphetamine.

As already discussed, it is readily apparent that the prosecutor's ridiculous hypothetical about a defendant's presumption of innocence confused the jury based on M.K.'s and J.S.'s responses to the prosecutor's question about the State's burden of proof immediately after making the fictitious hypothetical. The hypothetical conflated the potential jurors' roles as impartial fact-finders with that of eyewitnesses to a crime while insinuating that the State had direct evidence of Campbell's guilt. Also, the prosecutor's absurd hypothetical improperly called for a prejudgment by the prospective jurors of the

prosecutor's supposed case (by contrasting Campbell's presumption of innocence to which he is entitled to at all stages of trial against the prosecutor's hypothetical—with the supposed case—the prosecutor slapping the court reporter in front of all the prospective jurors). See *Clark*, 164 Conn. at 226.

I do not believe that prejudicial error was avoided because other parts of the closing arguments and a jury instruction properly told the jury of the burden of proof. Here, Campbell established that the prosecutor erred during voir dire when she introduced an inflammatory ridiculous hypothetical about a defendant's presumption of innocence. Also, because of the prosecutor's repeated arguments in her closing that Campbell had the burden of introducing evidence to create a reasonable doubt of his guilt, I cannot presume, as the majority willingly does, that the jury was unaffected by the prosecutor's ridiculous hypothetical or the prosecutor's closing arguments. Thus, did the jury properly conduct its deliberations free from confusion? No. The jury verdicts here were inconsistent in this case. All doubts as to the harmful effects of these prosecutorial errors should be resolved in favor of Campbell.